### UNITED STATES v. NEW YORK CENT. COAL CO. et al.

(Circuit Court of Appeals, Second Circuit.   April 19, 1904.)

1. CONTRACTS—CONSTRUCTION—BREACH.

   Defendant agreed to furnish to the United States, during the fiscal year ending June 30, 1902, 600 tons of bituminous coal, with 30 per cent. additional at the buyer's option, which was subsequently exercised.   On June 4, 1902, 246 tons remaining undelivered, defendant was notified to deliver the balance "as soon as practicable"; but, no coal having been delivered by 11:30 a. m. on June 27th, the buyer demanded the balance due and stated that defendant might have until 1 o'clock on that day "to decide." The buyer's agent returned at that hour, and was informed that defendant "was not going to deliver the coal." *Held*, that the demand on June 27th should not be construed as requiring a delivery by 1 o'clock on that day, but as a demand for performance within the contract period, and hence defendant's reply might properly be treated as a repudiation of the contract.

In Error to the Circuit Court of the United States for the Southern District of New York.

Writ of error to review a judgment, dismissing the complaint on the merits, entered pursuant to an order to that effect made at the trial.   The United States, the plaintiff in error, was plaintiff below, and the New York Central Coal Company and the surety, the Union Surety & Guaranty Company, were defendants.   The action was to recover damages for breach of contract.

Henry L. Burnett, U. S. Atty., and Arthur M. King, Asst. U. S. Atty.

Moses D. Moss, for defendant in error New York Cent. Coal Co.

Before TOWNSEND and COXE, Circuit Judges.

COXE, Circuit Judge.   On May 8, 1901, Capt. Folger, acting for and in behalf of the United States, entered into a contract with the New York Central Coal Company (hereafter called the defendant), by which that company agreed, during the fiscal year ending June 30, 1902, to furnish and deliver to the plaintiff, at the general lighthouse depot at Tompkinsville, N. Y., 600 tons of bituminous coal at an agreed price.   The plaintiff reserved the right to increase or decrease the stipulated number of tons to the extent of 30 per cent. On June 4, 1902, after the delivery of 503½ tons, the plaintiff served upon the defendant the following notice:

"You will please deliver, under the terms of your contract 277 tons (not more) of Georges Creek bituminous coal at this depot (Tompkinsville) as soon as practicable."

The plaintiff thus exercised its option to call for the maximum amount provided for by the contract.   On the 7th day of June the defendant asked a delay until the end of the month in furnishing the coal thus demanded.   Whether or not the request was refused does not appear.   On the 27th day of June, at about half-past 11 in the morning, the plaintiff demanded that the entire amount then due on the contract, 246 tons, be delivered and that the defendant might have until 1 o'clock on the same day to decide.

The chief clerk of the third lighthouse district, who was acting for Capt. Folger in these negotiations, testified as follows:

"I went out and returned at 1 o'clock, and saw him and asked him if he was going to deliver the coal, and he said 'No,' that he was not going to deliver the coal. Then I said, 'If you do not deliver it, we will purchase in the open market in accordance with the contract, and charge the difference against your bond,' and he said, 'All right,' or words to this effect, 'You can purchase the coal.'"

Coal was purchased on the same day, but it was Allegheny and not Georges Creek coal.

The trial court dismissed the complaint on the ground that the final unqualified demand was not served until half-past 11 on the morning of June 27th "and required immediate delivery of 246 tons, which time was afterwards extended to 1 o'clock on the same day." The court was of the opinion that the demand of June 4th, which contained the qualifying words "as soon as practicable," gave the defendant such time as in its judgment was reasonable in which to make the delivery and, therefore, there could be no default, in any event, during the life of the contract, until an unqualified demand was given. Such a demand was given on the 27th but, in the opinion of the court, it only allowed an hour and a half in which to make the shipment, which was considered unreasonable if not impossible.

The crucial question, and in fact the only question, is whether the court erred in dismissing the complaint. Upon this question we get but little assistance from the briefs. The defendant's brief is largely, and the plaintiff's brief is almost exclusively, devoted to a discussion of exceptions relating to the question of damages. In our view all this is irrelevant to the point in issue. If the plaintiff failed to prove a cause of action it is wholly immaterial what damages it suffered; if, on the other hand, the court erred in dismissing the complaint, a new trial must be ordered and, in either case, a ruling upon the question of damages, as presented by the present record, will be utterly inconsequential. It is quite probable that, in the event of a new trial, the testimony upon this question will be more satisfactory and complete. It seems to have been assumed that the occurrences on June 27th amounted to an unconditional demand to deliver 246 tons of coal at Tompkinsville, Staten Island, within an hour and a half after notice was served at No. 29 Broadway, New York. Such a demand, if made, was not only unreasonable, it was unconscionable, and the action of the trial court in holding that the defendant was not placed in default by failure to comply would not be open to criticism. But we are unable to accept this view of the transaction as correct.

Twenty-three days prior to this interview between the parties, a written demand had been served for the delivery of the coal due upon the contract, and a number of oral notices of similar import had been given the defendant by telephone. No coal had been furnished and but three days more remained of the life of the contract. It was necessary to get a definite answer from the defendant whether it intended to furnish the coal or not. When the plaintiff's agent, Mr. Conover, called upon the defendant's secretary, Mr. Goodstein, and

asked him what he intended to do, he was informed by the latter that he could not answer at the moment as some one higher in authority would have to be consulted and he asked Conover if he would call again. Conover testifies: "I said yes, I would give him until 1 o'clock." Not until 1 o'clock to deliver the coal, but to decide whether he intended to perform or repudiate the contract. When Conover returned the conversation previously quoted took place and it is incompatible with the theory that the defendant was in default by reason of the nondelivery of the coal before 1 o'clock. "I asked him," said Conover, "if he was going to deliver the coal," not if he had delivered the coal. Goodstein replied, "No, he was not going to deliver the coal." The entire conversation shows conclusively, to our minds, that the contract was still in force and was so treated by both parties until the defendant flatly repudiated it by refusing to perform its stipulations. If Conover had intended his interview at half-past 11 as a peremptory notice to deliver the coal by 1 o'clock of the same day he would not have returned at the latter hour; he would have known that delivery was out of the question. The mere fact that he returned is conclusive proof that he did not consider it final. In addition to this Conover testifies expressly that his object in seeking the interview was "to give him a chance to deliver the coal under the terms of the contract."

There is evidence that a letter was presented to Goodstein at the interview on the 27th, which was a demand to deliver 277 tons of coal, but the letter was not introduced in evidence and the witness was not permitted to state its contents in detail. This letter, so far as its purport is disclosed, throws no additional light on the controversy. The contract provided that the coal was "to be furnished in such quantities and at such times during the fiscal year as the inspector may require," and the defendant agreed "to be governed in all matters regarding the fuel to be delivered under this contract" by the inspector or his authorized agent. On June 4, 1902, 246 tons of coal were due under the contract. On that day the defendant was notified to deliver the coal. The words "as soon as practicable" did not change the legal obligation of the defendant; the law implied a reasonable time in which to make the delivery. If nothing more had been done it seems obvious that the defendant would have been in default and liable for damages if he had allowed the contract to expire without making the delivery. Did anything transpire thereafter to change the legal status of the defendant? We think not. The notice of June 4th remained in full force; it was never withdrawn, changed or modified. In the absence of all proof to the contrary it cannot be said that 26 days was not sufficient time within which to deliver 246 tons of coal. Yet during 23 days of this period the defendant did nothing and the record contains no shadow of an excuse for this inaction. The interview of June 27th was the final effort of the plaintiff to induce the defendant to perform its contract and had the defendant desired to make the delivery during the three remaining days he would undoubtedly have been permitted to do so. If consent were necessary it would have been granted, although we see no reason why the defendant had not, in any event, the strict le-

gal right to make the delivery pursuant to the provisions of the contract.

It will be noted that no complaint was made by the defendant that insufficient time had been allowed. No additional time was requested and no excuse of any kind was presented. The final demand for performance was met by a point blank refusal. The contract was then at an end and the plaintiff was not called on to wait longer to secure the coal which defendant had agreed to furnish. The repudiation of the contract, so far as the facts are disclosed by the present record, appears, in our judgment, to have been without palliation or excuse. We think, therefore, that it was error to dismiss the complaint.

The judgment is reversed.